DA 08-0110

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 273

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

MICHAEL JAMES COLUCCIO, II,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-07-279
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jim Wheelis, Chief Appellate Defender; Koan Mercer, Assistant Appellate Defender, Helena, Montana

        For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Sheri K. Sprigg, Assistant Attorney General, Helena, Montana

            Fred R. Van Valkenburg, Missoula County Attorney, Missoula, Montana

Submitted on Briefs:  January 7, 2009

Decided:  August 17, 2009

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court

¶1     After trial by jury, Michael James Coluccio, II, was convicted in the Fourth Judicial District Court, Missoula County, of the offense of vehicular homicide while under the influence.   Coluccio appeals the following issues:

¶2     Issue 1:   Did the District Court err in instructing the jury on the element of criminal negligence?

¶3     Issue 2:   Did the District Court err in denying Coluccio's motion to dismiss for insufficient evidence?

¶4     Issue 3:   Did the District Court err in imposing restitution?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     Around 4:30 p.m. on July 14, 2007, Coluccio was driving his Chevrolet Suburban eastbound on Highway 200 east of Missoula.   When he reached the intersection with Johnsrud Road, Coluccio slowed down, activated his turn signal and initiated a left turn. Coluccio turned into John Troyer, who was travelling westbound on his motorcycle. Troyer died as a result of the collision.

¶6     After the collision, the motorcycle and Coluccio's Suburban caught fire. Witnesses to the crash attended to Troyer.   Coluccio led his family and friends, who were his passengers, a safe distance from the fire.   Coluccio then returned to his Suburban to try to remove his raft from its roof.  He did not check Troyer's condition.

¶7     Highway Patrol Troopers Chad Dever and Sean Finley were dispatched to the scene to investigate.   They testified at trial they smelled alcohol on Coluccio's breath and

his eyes appeared glassy. One hour and forty-five minutes after the accident, Trooper Finley obtained a blood alcohol test from Coluccio. The test showed Coluccio's blood alcohol level was 0.07.

¶8 In a statement to law enforcement, Coluccio said that, prior to leaving his home in East Missoula around 3:00 p.m., he consumed three beers starting at around 1:00 p.m. He later testified he may have had four beers. He said the beer had no effect on his driving because, to him, "Coors Light is like water."

¶9 Coluccio stated he simply did not see the motorcycle coming until it was too late and that the accident occurred because, "my guess is that the motorcyclist, he just . . . must have sped up around that corner and then just flew by not, you now, really paying attention to what he was doing. . . ."

¶10 The State charged Coluccio with felony vehicular homicide while under the influence, misdemeanor driving while his license was suspended, and failure to carry proof of liability insurance. Coluccio pled guilty to the misdemeanor charges and not guilty to vehicular homicide.

¶11 At trial, occupants of the vehicle travelling behind Coluccio for the ten miles before the crash testified he was not driving erratically and did not exceed the speed limit. The driver directly behind Troyer at the time of the crash testified that Coluccio "cut off the motorcyclist." A couple waiting at the stop sign at Johnsrud Road testified they saw the motorcycle coming around the bend of Highway 200, an estimated 75 yards from the intersection, and it appeared to be going the speed limit. Trooper Mike Burman, an

accident reconstructionist who investigated the accident, testified that at the rate of speed Troyer was travelling, anyone sitting at the intersection would have been able to see him for about nine seconds before he entered the intersection. Lynn Kurtz, a forensic toxicologist from the State Crime laboratory testified Troyer did not have any alcohol or drugs in his system that would affect his ability to drive safely.

¶12 The prosecutor posed a hypothetical question to Kurtz asking him to assume the following facts: the crash occurred at approximately 4:30 p.m.; authorities drew a blood sample from Coluccio almost two hours after the crash, showing that his blood alcohol content was 0.07; Coluccio did not consume any alcohol within those two hours; Coluccio weighs approximately 190 pounds; and, Coluccio told a trooper he consumed three beers between noon and 3:00 p.m.[1] Kurtz was then asked if he had an opinion as to whether Coluccio's blood alcohol content would have changed between the time of the crash and when the blood test was administered.

¶13 Kurtz said, based on the assumptions given to him, Coluccio's blood alcohol level would have peaked around 4:00 p.m. and, although elimination rates depend on various factors that were not in evidence or assumed, he would estimate Coluccio's blood alcohol content at the time of the crash to have been between 0.095 and 0.135. Kurtz also opined that a person with a blood alcohol content between 0.095 and 0.135 would have problems with reasoning and judgment, hearing, performing divided attention tasks, and would have tunnel vision. On cross-examination, Kurtz said his estimates for Coluccio's blood

---

[1] Coluccio told police and testified at trial that he started drinking at 1:00 p.m.

4

alcohol content at the time of the crash were extrapolated and he would need further facts to determine Coluccio's exact level of blood alcohol content when the crash occurred.

¶14 The jury found Coluccio guilty of vehicular homicide while under the influence. The District Court sentenced him to 30 years at Montana State Prison, with 15 suspended. At the sentencing hearing, the State sought restitution, the details of which are discussed below.

## STANDARD OF REVIEW

¶15 We review jury instructions to determine whether the instructions, taken as a whole, fully and fairly instruct the jury as to the applicable law and whether the district court abused its discretion. *State v. Nick*, 2009 MT 174, ¶ 8, 350 Mont. 533, 208 P.3d 864. If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error. *Nick*, ¶ 8.

¶16 We review a district court's denial of a motion to dismiss for insufficient evidence de novo if the court based its denial on a conclusion of law. *State v. Swann*, 2007 MT 126, ¶ 16, 337 Mont. 326, 160 P.3d 511.

## DISCUSSION

¶17 *Issue 1: Did the District Court err in instructing the jury on the element of criminal negligence?*

¶18 A person commits the offense of vehicular homicide while under the influence if he negligently causes the death of another human being while operating a vehicle under the influence of alcohol. Sections 45-5-106(1), 61-8-401(1), MCA. In order to be

convicted of negligent vehicular homicide, a defendant must be found to be both under the influence and criminally negligent.

¶19 Coluccio does not appeal from the jury's factual conclusion that he drove under the influence of alcohol. He argues that the court improperly instructed the jury concerning the element of criminal negligence. Section 45-2-101(43), MCA, provides:

> "Negligently"-- a person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care. Relevant terms, such as "negligent" and "with negligence", [sic] have the same meaning.

¶20 After the close of the evidence, the District Court told the jury in Instruction 12 that in order to convict Coluccio of vehicular homicide while under the influence, it must find the State had proved Coluccio was: (1) driving or in actual physical control of a vehicle; (2) upon the roadways of this state open to the public; (3) while under the influence of alcohol; and, (4) negligently caused the death of John Eric Troyer.

¶21 The District Court's Instruction 17 reads:

> In a criminal case, a person acts negligently when an act is done with a conscious disregard of the risk, or when the person should be aware of the risk by driving a motor vehicle after consuming alcohol and failing to yield the right of way to oncoming traffic on a highway.
>
> The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care.

6

¶22 Coluccio argues on appeal that Instruction 17 erroneously told the jury he was criminally negligent if he drove a vehicle after drinking alcohol and then failed to yield to an oncoming vehicle, omitting the requirement that the jury conclude he was criminally negligent. He claims the jury was, in effect, told it need not consider whether he grossly deviated from ordinary care in disregarding the risk or in failing to be aware of the risk he took in driving while under the influence. Coluccio argues that Instruction 17 took away his defense that, while he drove after drinking, he was not criminally negligent in doing so.

¶23 Considering Instruction 17, the jury could find Coluccio was criminally negligent by driving after drinking alcohol. As the dissent notes, it is not necessary under this particular instruction that the jury conclude he was under the influence to be criminally negligent. However, considering the instructions as a whole, in particular Instruction 12, it was necessary for the jury to conclude Coluccio was indeed under the influence in order to convict him of the charged offense.

¶24 We conclude that Instruction 17, when considered in conjunction with the instructions as a whole, is not misleading. The language in Instruction 17 that Coluccio complains of: "when the person should be aware of the risk by driving a motor vehicle after consuming alcohol and failing to yield the right of way to oncoming traffic," defines the risk taken under the specific circumstances of this case. The jury was then instructed that taking this risk must be a gross deviation from reasonable conduct. When read in conjunction with the requirement in Instruction 12--that the State must prove that his

negligence caused Troyer's death--the court fully and fairly instructed the jury that in order to convict, it must find Coluccio was both under the influence and criminally negligent.

¶25    After the District Court instructed the jury, the prosecutor argued that Coluccio was both under the influence and criminally negligent as his conduct constituted a gross deviation from the standard of care. Coluccio's counsel pointed out to the jury that not only did the State have to prove Coluccio was at fault, but had to also prove his conduct was a gross deviation from the standard of care. Coluccio was not deprived of the defense that he was not criminally negligent. We cannot conclude the District Court erred in instructing the jury.

¶26    *Issue 2: Did the District Court err in denying Coluccio's motion to dismiss for insufficient evidence?*

¶27    After the State presented its case-in-chief, Coluccio moved to dismiss for insufficient evidence, asserting that no reasonable jury could conclude beyond a reasonable doubt that he was either under the influence of alcohol or criminally negligent. Coluccio renews his argument on appeal, asserting the State failed to introduce evidence he was impaired by alcohol and that his actions grossly deviated from ordinary care.

¶28    A motion to dismiss for insufficient evidence must be granted if, viewing the evidence in a light most favorable to the prosecution, there is no evidence upon which a rational trier of fact could find the essential elements of the crime exist beyond a reasonable doubt. *Swann*, ¶ 16. Here, the essential elements at issue are whether

8

Coluccio was under the influence of alcohol and whether he was criminally negligent. Sections 45-2-101(43), 45-5-106(1), 61-8-401(1), MCA.

¶29 It was undisputed Coluccio's blood alcohol content was 0.07 two hours after the crash. That fact, combined with the facts that Coluccio admitted he drank three, maybe four, beers immediately before he started driving; his breath smelled like alcohol and his eyes were glassy; typically a person with a 0.07 level of blood alcohol would have at least a 0.08 blood alcohol level two hours earlier; and alcohol affects a person's ability to operate a motor vehicle, forces the conclusion that the State presented sufficient evidence for a rational trier of fact to determine Coluccio drove while under the influence of alcohol. Further, the crash itself is circumstantial evidence that Coluccio's safe driving abilities were diminished.

¶30 Coluccio is incorrect that a reasonable juror could not conclude his actions rose to the level of criminal negligence simply because failing to yield to another vehicle when making a left turn is a minor traffic violation. Coluccio drank at least three beers just before getting behind the wheel of his car. He turned in front of a visible oncoming motorcycle. Three other drivers testified they could see the motorcycle coming. His consumption of alcohol and his driving are sufficient evidence for a reasonable juror to conclude that turning in front of Troyer was a gross deviation from ordinary care. The District Court did not err in denying Coluccio's motion to dismiss for insufficient evidence.

9

¶31 *Issue 3: Did the District Court err in imposing restitution?*

¶32 At the sentencing hearing and in its written judgment, the District Court imposed restitution in the amount of $1,400,000. Coluccio complains that the amount of restitution imposed upon him by the District Court is neither allowed by statute nor substantiated by evidence in the record, as required by § 46-18-243(1)(a), MCA.

¶33 The State responds, first, that Coluccio failed to object to the amount of restitution at the hearing, thus waiving his right to appeal. Second, if we conclude Coluccio did preserve his right to appeal, we should defer to the District Court's judgment of Robyn Troyer's credibility and conclude her testimony substantiated the restitution award.

¶34 Generally, this Court will not hear issues raised for the first time on appeal. However, we may review a sentence's legality even if the defendant raises no objection in the district court. *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892. A sentence is not legal if it does not fall within statutory parameters. *Kotwicki*, ¶ 13. An illegal sentence is void to the extent it exceeds statutory authority; only the portion of the sentence beyond the district court's statutory authority is illegal. *State v. White*, 2008 MT 464, ¶ 25, 348 Mont. 196, 199 P.3d 274 (citing *DeShields v. State*, 2006 MT 58, ¶ 11, 331 Mont. 329, 132 P.3d 540 (stating "[a] sentence in excess of one prescribed by law is not void ab initio because of the excess, but is good insofar as the power of the court extends and is invalid only as to the excess")).

¶35 Objectionable sentences are those where a defendant challenges the application of a sentencing statute to his particular case. *State v. Strong*, 2009 MT 65, ¶¶ 14-15, 349

Mont. 417, 203 P.3d 848 (citing *State v. Mainwaring*, 2007 MT 14, ¶ 20, 335 Mont. 322, 151 P.3d 53). We do not hear an issue that is objectionable, rather than illegal, unless it is objected to in the district court. *Strong*, ¶ 13.

¶36 In Montana, a victim who has sustained pecuniary loss can obtain restitution as a part of a criminal sentence. Section 46-18-241(1), MCA. Pecuniary loss means,

> (a) all special damages, but not general damages, substantiated by evidence in the record, that a person could recover against the offender in a civil action arising out of the facts or events constituting the offender's criminal activities, including without limitation out-of-pocket losses, such as medical expenses, loss of income, expenses reasonably incurred in obtaining ordinary and necessary services that the victim would have performed if not injured, expenses reasonably incurred in attending court proceedings related to the commission of the offense, and reasonable expenses related to funeral and burial or crematory services;
>
> (b) the full replacement cost of property taken, destroyed, harmed, or otherwise devalued as a result of the offender's criminal conduct;
>
> (c) future medical expenses that the victim can reasonably be expected to incur as a result of the offender's criminal conduct, including the cost of psychological counseling, therapy, and treatment; and
>
> (d) reasonable out-of-pocket expenses incurred by the victim in filing charges or in cooperating in the investigation and prosecution of the offense.

Section 46-18-243(1), MCA. A "victim" is the estate of a deceased or incapacitated victim or a member of the immediate family of a homicide victim. Section 46-18-243(2)(a)(ii), MCA. If the court believes a victim may have sustained a pecuniary loss, the court shall order a probation officer to prepare a presentence report and include a list of the defendant's assets and an affidavit specifically describing the victim's pecuniary loss and the replacement value in dollars. Section 46-18-242(1), MCA.

11

¶37    Coluccio's presentence report included a restitution list prepared by the deceased John Troyer's wife, Robyn, concerning which Ms. Troyer testified at the sentencing hearing. We deem Ms. Troyer's sworn testimony at the sentencing hearing to satisfy the affidavit requirement of § 46-18-242(1), MCA.

¶38    Ms. Troyer claimed restitution for expenses incurred by her friends in travelling to attend the trial and the sentencing hearing. We conclude that awarding restitution for travel costs incurred by friends of a victim to lend moral support is outside of the statutory parameters of § 46-18-241, MCA, and § 46-18-243(1), (2), MCA. The remainder of the restitution amounts Coluccio complains about--counseling services, home repair services, and lost wages--may be imposed under § 46-18-243(1)(a), (c), MCA.

¶39    At the sentencing hearing, the prosecutor was not prepared to offer testimony concerning the amount of restitution claimed. The District Court advised it would require testimony to substantiate the amount claimed. The State moved to continue the hearing as it related to restitution. Coluccio's counsel objected to any continuance. Ms. Troyer was examined and cross-examined concerning restitution. Upon examination of the record, we conclude that Coluccio sufficiently objected to the restitution amounts for counseling services, home repair services, and Troyer's lost wages to preserve them for appeal.

¶40    The Montana Rules of Evidence do not apply to a sentencing hearing. M. R. Evid. 101(c)(3). Still, a defendant has the right to have a sentence imposed based upon

12

substantially correct information. *State v. Herman*, 2008 MT 187, ¶ 21, 343 Mont. 494, 188 P.3d 978; *State v. Bar-Jonah*, 2004 MT 344, ¶ 118, 324 Mont. 278, 102 P.3d 1229. Findings of fact regarding the amount of restitution ordered as a part of a criminal sentence are reviewed to determine whether they are clearly erroneous. *State v. Heath*, 2004 MT 126, ¶ 13, 321 Mont. 280, 90 P.3d 426. Such findings are clearly erroneous, *inter alia*, if not supported by substantial evidence. *State v. Breeding*, 2008 MT 162, ¶ 11, 343 Mont. 323, 184 P.3d 313. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Johnston v. Palmer*, 2007 MT 99, ¶ 26, 337 Mont. 101, 158 P.3d 998.

¶41 Ms. Troyer testified she was entitled to restitution for $35,000 she would incur as psychological counseling for herself and her children. She based this assumption on a cost of $100 per session with a counselor and 150 visits. When asked how she came up with the $100 per session amount, she said, "On that figure, I was actually at a loss. But I asked a few friends that had been to counseling, approximately what to figure based on their expenses, and that's how I came up with that." The District Court awarded $10,000 for counseling.

¶42 Ms. Troyer calculated $100 per month for 40 years for a total of $40,000, as the cost of home repairs her deceased husband would have performed. When defense counsel asked her if she reduced the home repair to present value, she said she did not know what that meant. When present value was explained to her, she said, "I just assumed that I would spend a minimum of $100 a month paying somebody to do the

13

things that John would be able to do himself." The District Court awarded her $20,000 for home repairs.

¶43 Finally, Ms. Troyer calculated $2,992,165 as restitution for her husband's lost wages. She based her calculations on one of Troyer's paystubs from the National Guard and his "other jobs." When asked by the District Court how she came up with an annual salary of $92,472, when Troyer's paystub showed half-year gross earnings of $27,608, Ms. Troyer said, "What I based that on is, he also had other jobs. Like he flew privately for a helicopter company. When he wasn't doing that, he worked more for the [National Guard]. So I just took that paycheck and said this is what he would potentially earn." When asked where his paychecks came from when he was working for the National Guard in New Mexico, Ms. Troyer said she did not know.

¶44 Concerning the amount claimed for lost wages, the State referred Ms. Troyer to a document prepared by an attorney-friend of hers that calculated the amount of lost wages as $1,338,504. Defense counsel objected to Ms. Troyer testifying about a document she did not prepare, by a person who was not present, that concerned a matter of opinion. The District Court overruled the objection and awarded $1,338,504 for lost wages.

¶45 We cannot conclude that the amounts set by the District Court for counseling services, home repair services, and lost wages were substantiated by evidence in the record, as required by § 46-18-243(1)(a), MCA. Ms. Troyer stated she was "at a loss" when calculating the counseling expenses, she "assumed" the home repair expenses, her husband had the "potential" to make $92,000 a year, and she did not know how her

14

attorney-friend prepared lost income figures she presented. Assumptions, ballpark figures from friends, and purely speculative calculations are insufficient information upon which to make findings of fact. We conclude the restitution imposed by the District Court for expenses of friends of the victim, counseling services, home repair services, and lost wages must be legally and factually reconsidered. The District Court's imposition of restitution for these items cannot be sustained.

## CONCLUSION

¶46    With the sole exception of the amount of restitution, the judgment of the District Court is affirmed. That portion of the judgment determining the amount of restitution for expenses of friends of the victim, counseling services, home repair services, and lost wages is reversed. This case is remanded to the District Court to determine the correct amount of restitution to be imposed in accord with this opinion and applicable law.


/S/ JOHN WARNER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE


Justice James C. Nelson dissents.

¶47    I dissent from the Court's Opinion as to Issues 1 and 3, and since I would reverse and remand for a new trial on Issue 1, I do not reach Issue 2.

15

¶48 First, I disagree with the Court's resolution of Issue 1. In my view, Instruction 17 misstates the law. Over objection, the court gave Instruction 17 as follows:

> In a criminal case, a person acts negligently when an act is done with a conscious disregard of the risk, **or** when the person should be aware of the risk **by driving a motor vehicle after consuming alcohol** and failing to yield the right of way to on-coming traffic on a highway.
> The risk must be of a nature and degree that to disregard it involves gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care. [Emphasis added.]

¶49 The pattern instruction (MCJI 2-105) states: "A person acts negligently when an act is done with a conscious disregard of the risk, or when the person should be aware of the risk by [*here insert applicable conduct related to the case*]." According to the State, the purpose of inserting language that describes the particular acts alleged to have been negligently performed is simply to specify those acts that the jurors were required to review in deciding whether negligence had been proven, not to decide the issue for them. While that may be true, the bolded language in the court's Instruction 17 misstates the law. The applicable conduct which should have been inserted in the instruction was driving while under the influence of alcohol. DUI is a criminal offense. Driving a motor vehicle "after consuming alcohol" is not a criminal offense. It becomes a criminal offense only if, after consuming alcohol, the driver is "under the influence."

¶50 Instruction 17 informed the jury that it could determine that defendant acted negligently in one of two ways: (1) if he acted with a conscious disregard of the risk; or (2) if he should have been aware of the risk of driving a motor vehicle after consuming alcohol and by failing to yield the right-of-way to oncoming traffic on a highway. The

16

trial evidence was undisputed that the defendant had consumed alcohol at some point prior to the accident. The evidence was, however, that at the time of the accident his blood alcohol level could have been as low as 0.07 or as high as 0.13. If his blood alcohol level was 0.07, then he was presumptively not under the influence, although his alcohol concentration was properly considered as competent evidence. *See* § 61-8-401(4), MCA.

¶51 I am not persuaded by the Court's determination, Opinion, ¶ 24, that any error in giving this instruction was cured by all of the other instructions. Instruction 17 is unlike any that this Court has ever approved. Since here we approve Instruction 17, now a defendant can be found criminally negligent if he drives a motor vehicle after consuming alcohol whether he is under the influence or not. That is not the law, and, accordingly, I would reverse and remand for a new trial with a proper instruction.

¶52 I address Issue 3 because I strongly disagree with the Court's determination to "deem" Robyn Troyer's sworn testimony at the sentencing hearing as satisfying the affidavit requirement imposed under § 46-18-242(1), MCA. Opinion, ¶ 37. In one sentence the Court baldly abrogates a fundamental requirement of the statute and establishes precedent that will allow prosecutors, probation officers and trial courts across the state to simply ignore the affidavit requirement of § 46-18-242(1), MCA, and, instead, substitute sworn testimony at the sentencing hearing.

¶53 A sentencing court is not authorized to impose a condition of restitution on a sentence until all of the detailed procedures in §§ 46-18-241 to -249, MCA, are satisfied.

17

*State v. Pritchett*, 2000 MT 261, ¶ 7, 302 Mont. 1, 11 P.3d 539; *State v. Benoit*, 2002 MT 166, ¶ 23, 310 Mont. 449, 51 P.3d 495; *see also State v. Hunt*, 2009 MT 265, ¶ 16, ___ Mont. ___, ___ P.3d ___.

¶54 Section 46-18-242, MCA, provides:

> (1) Whenever the court believes that a victim may have sustained a pecuniary loss or whenever the prosecuting attorney requests, the court shall order the probation officer, restitution officer, or other designated person to include in the presentence investigation and report:
> (a) a list of the offender's assets; and
> (b) an affidavit that specifically describes the victim's pecuniary loss and the replacement value in dollars of the loss, submitted by the victim.
> (2) When a presentence report is not authorized or requested, the court shall accept evidence of the victim's loss at the time of sentencing.

¶55 An affidavit is defined as "a written declaration under oath, made without notice to the adverse party." Section 26-1-1001, MCA; s*ee also Black's Law Dictionary* 62 (Bryan A. Garner ed., 8th ed., West 2004) (An affidavit is "[a] voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths, such as a notary public."). The form of an ordinary oath is also defined in statute as follows:

> An oath or affirmation in an action or proceeding may be administered by the person who swears or affirms expressing that person's assent when addressed with "You do solemnly swear (or affirm, as the case may be) that the evidence you will give in this issue (or matter), pending between .... and ...., is the truth, the whole truth, and nothing but the truth, so help you God."

Section 1-6-102, MCA.

¶56 Quite simply, sworn testimony is not the same thing as a "written declaration under oath." *See McDermott v. Carie, LLC*, 2005 MT 293, 329 Mont. 295, 124 P.3d 168

18

(holding strictly to the requirement that an affidavit must be sworn to on the basis of personal knowledge). Ms. Troyer's sworn testimony is not, by definition, an affidavit, and it cannot be "deem[ed]" as such.

¶57 Presumably the Legislature included the affidavit requirement in the statute so as to insure the accuracy and basis for restitution claims—to put the affiant under penalty of perjury or false swearing—and to give the defendant the opportunity to verify the restitution claims or be prepared to challenge those at the sentencing hearing. Ignoring the affidavit requirement abrogates those requirements of § 46-18-242, MCA, and, instead, encourages the sort of crap-shoot sentencing proceeding that occurred in this case. Ignoring the affidavit requirement also encourages the prosecutor to surprise and sandbag the defense with restitution evidence and claims presented for the first time at the sentencing hearing. *See State v. McMaster*, 2008 MT 268, ¶¶ 47-61, 345 Mont. 172, 190 P.3d 302 (Nelson, J., dissenting).

¶58 While § 46-18-242(2), MCA, allows the court to accept evidence of the victim's loss at the time of sentencing where a presentence report is not authorized or requested, that is not the case here. In this case, there was a presentence report, and under the clear and unambiguous requirements of the black-letter law, § 46-18-242(1)(b), MCA, the presentence report was required to include "an affidavit that specifically describe[d] the victim's pecuniary loss and the replacement value in dollars of the loss, submitted by the victim." There was no such affidavit of Ms. Troyer. Perhaps, if there had been, we

19

would not be addressing the unlawful claims for restitution damages that were admitted into evidence at the sentencing hearing and which the trial court allowed.

¶59    Instead of simply blowing-off the requirements of § 46-18-242(1)(b), MCA (a determination for which the Court cites no authority), we should require probation officers, prosecutors and trial courts to follow the laws which the Legislature has enacted.  When, as here, we simply ignore the law, we encourage sloppy trial practice by probation officers and attorneys and error by the lower courts—which, of course, generates more appeals; we gain nothing.  I cannot agree with this approach.

¶60    I, too, would reverse the various damage claims referred to in ¶ 46 of the Opinion. In doing so, I would also require the probation or restitution officer to gather and submit with an amended PSI, the affidavits which § 46-18-242(1)(b), MCA, requires.

¶61    I dissent.


                                              /S/ JAMES C. NELSON